UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

PORTLAND DIVISION

GARY J. SCHULZ, an individual and
THE ESTATE OF DONALD R. GARRIS,

               Plaintiffs,

      v.

VISIONARY PROPERTIES, INC., a
Delaware corporation and HVHC, INC., a
Delaware corporation,

               Defendants.

———————————————

VISIONARY PROPERTIES, INC., a
Delaware corporation and HVHC, INC., a
Delaware corporation,

         Counterclaim Plaintiffs,

      v.

GARY J. SCHULZ, an individual and

Civ. No. 3:14-cv-01129-AC

OPINION AND
ORDER

Page 1 - OPINION AND ORDER                                        {SIB}

THE ESTATE OF DONALD R. GARRIS,

      Counterclaim Defendants.
_____

ACOSTA, Magistrate Judge:

*Introduction*

Plaintiffs Gary J. Schulz ("Schulz"), and the Estate of Donald R. Garris ("Garris Estate") (collectively "Plaintiffs"), filed this action against Visionary Properties, Inc. ("Visionary"), and HVHC, Inc., ("HVHC") (collectively "Defendants"), alleging breach of contract, intentional interference with economic relations, and breach of the duty of good faith and fair dealing. Currently before the court is Defendants' motion for summary judgment on all of Plaintiffs' claims.

The court finds Plaintiffs did not present admissible evidence of an oral agreement by Defendant to continue its relationship with Plaintiffs, Defendants did not breach its contractual agreement with Schulz, Defendants' alleged breach of its contract with Donald R. Garris ("Garris") defeats Garris's claim for breach of the duty of good faith and fair dealing, and HVHC is not a party to Garris's contract with Visionary. Accordingly, Defendants' motion for summary judgment is denied with regard to the alleged breach of the express terms of the contract between Visionary and Garris, and granted in all other respects.[1]

*Preliminary Procedural Matters*

The evidence presented in support of or in opposition to a motion for summary judgment must be based on personal knowledge, properly authenticated, and admissible under the Federal Rules of Evidence. FED. R. CIV. P. 56(c) (2015). The court must determine what evidence is

_____

[1]The parties have consented to jurisdiction by magistrate judge in accordance with 28 U.S.C. § 636(c)(1).

admissible, relevant, and substantive.  FED. R. EVID. 104 (2015).  A party filing a motion for summary judgment will generally support that motion with affidavits or declarations.  Rule 56 requires that the affidavits or declarations "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  FED. R. CIV. P. 56(c)(4).  In ruling on a motion for summary judgment, the court will consider the admissibility of the proffered evidence's contents, not its form.  *Fraser v. Goodale*, 342 F.3d 1032, 1036 (9th Cir. 2003) ("At the summary judgment stage, we do not focus on the admissibility of the evidence's form.  We instead focus on the admissibility of its content."); *Celotex Corp. v. Catrett*, 477 U.S. 317, 324 (1986) ("We do not mean that the nonmoving party must produce evidence in a form that would be admissible at trial in order to avoid summary judgment.").

In their reply in support of the motion for summary judgment, Defendants object to numerous exhibits and portions of declaration testimony offered by Plaintiffs to support their summary judgment opposition.  In response, Plaintiffs assert their evidence is based on personal knowledge, falls under applicable hearsay exceptions, and is properly authenticated.

I.  Kevin Brague Declaration

*A.  Declaration Objections*

Kevin Brague ("Brague") is Plaintiffs' attorney.  Defendants object to Paragraph 6[2] of Brague's declaration in which he represents a "former employee and executive of Defendants is willing to testify against Defendants but cannot due to a separation or settlement agreement absent a subpoena." (Brague Decl. ¶ 6.)  Paragraph 6 then summarizes the testimony the former employee

---

[2]Plaintiffs and Defendants both cite to Paragraph 16 of the Brague declaration.  However, Brague's declaration contains only six paragraphs.

would have provided.  Defendants argue Paragraph 6 is hearsay, and hearsay within hearsay.

Hearsay is defined as an out-of-court statement offered in evidence to prove the truth of the matter asserted.  FED. R. EVID. 801 (2015).  Hearsay is admissible only if it qualifies as an exception to the general hearsay rule.  The Ninth Circuit has generally applied the limitations found in the hearsay rule, set forth in Rule 802 of the Federal Rules of Evidence, to evidence offered by parties at the summary judgment stage.  *Orr v. Bank of America*, 285 F.3d 764, 778 (9th Cir. 2002); *Beyenne v. Coleman Sec. Services, Inc.*, 854 F.2d 1179, 1182 (9th Cir. 1988).  When a statement is hearsay within hearsay, or double hearsay, each statement must qualify under some exemption or exception to the hearsay rule.  FED. R. EVID. 805 (2015); *United States v. Arteaga*, 117 F.3d 388, 396 n.12 (9th Cir. 1997).

Brague's declaration contains out-of-court statements offered for the truth of the matter asserted.  Brague identifies various facts the former employee of Defendants is willing to testify to at trial.  For example, the declaration states the former employee would testify "during the time Drs. Garris and Schulz were subleasing optometrists, it was understood that their annual leases would be renewed absent good cause, gross misconduct, or flagrant abuse of company policies."  (Brague Decl. ¶ 6(c).)  Plaintiffs are clearly offering the testimony to support their position that the annual leases were wrongfully terminated.  Accordingly, the statement is being offered for the truth of the matter asserted and is hearsay.

Plaintiffs argue the former employee's testimony is admissible under Rule 804 either as a statement against the former employee's interest or a statement offered against the interests of Defendants, who wrongfully caused the former employee's unavailability.  Rule 804 provides an exception to the hearsay rule if the declarant is unavailable at trial  and the hearsay statements were:

1) given at a prior trial, hearing or deposition; 2) under belief of impending death; 3) against the declarant's proprietary or pecuniary interest; 4) concerning personal or family history; or 5) offered against the party that wrongfully and intentionally caused the declarant's unavailability. FED. R. EVID. 804 (2015). The statements offered by Plaintiffs are not against the former employee's interest, but against Defendants' interest. Accordingly, the statements do not qualify as a statement against interest.

Additionally, while Plaintiffs contend the former employee is unavailable as a result of the restriction in the separation agreement, Plaintiffs had the ability to obtain such testimony through subpoena despite the discovery stay entered by the court on December 1, 2015. The minute order discussing the stay directed Plaintiffs to provide defense counsel with a comprehensive list of discovery deemed necessary to respond to the pending motion for summary judgment. In the event Defendants disputed the necessity of the discovery, the parties were to advise the court of such disagreement. The court specifically stayed all other discovery pending a ruling on Defendants' summary judgment motion. Plaintiffs apparently did not advise Defendants of their need to subpoena the former employee, and the parties definitely did not advise the court of such need. Plaintiffs had the right, and the opportunity, to subpoena and depose the former employee under both the separation agreement and the court's stay of discovery. Plaintiffs' failure to subpoena the former employee, not Defendants' actions, made the former employee unavailable. Furthermore, Plaintiffs have failed to establish Defendants acted wrongfully, and with the intent to make the former employee unavailable as a witness in this matter. Rule 804(b)(6) does not apply to the former employee's statements.

Plaintiffs also argue the former employee's testimony falls under the residual exception of

Rule 807.  A hearsay statement is not excluded by the rule against hearsay even if the statement is not specifically covered by a hearsay exception in Rule 803 or 804 if: 1) the statement has equivalent circumstantial guarantees of trustworthiness; 2) the statement is offered as evidence of a material fact; 3) the statement is more probative on the point for which it is offered than any other evidence that the proponent can obtain through reasonable efforts; and 4) admitting the statement will best serve the purposes of these rules and the interests of justice.  FED. R. EVID. 807 (2015).  The residual exception to hearsay is typically reserved for exceptional circumstances.  *U.S. v. Bonds,* 608 F.3d 495, 500 (9th Cir. 2010).  The former employee's testimony does not fall under the residual exception because a witnesses availability only by subpoena is not an exceptional circumstance.  In addition, Plaintiffs were given the opportunity to identify discovery necessary to respond to Defendants' motion for summary judgment and could have subpoenaed the former employee despite the discovery stay.

Finally, Plaintiffs argue the former employee's statements are admissible because the statements show the former employee's state of mind.  Under Rule 803(3), the hearsay rule does not exclude a statement of the declarant's then existing state of mind.  However, Rule 803(3) does not allow an exclusion for a statement of memory or belief to prove the fact remembered or believed, unless it relates to the validity of the declarant's final will and testament.  FED. R. EVID. 803(3) (2015).  For example, a defendant's attempt to introduce a recording showing her then-existing state of mind refuting the intent requirement of a criminal charge was hearsay.  *U.S. v. Sayakhom* 186 F.3d 928, 937 (9th Cir. 1999).  ("Sayakhom's attempt to introduce statements of her belief (that she was not violating the law) to prove the fact believed (that she was acting in good-faith) is improper.").

The statements by the former employee found in Paragraph 6 of Brague's declaration are

inadmissible hearsay which do not fall under any of the hearsay exceptions and are, therefore, inadmissible.  The court is mindful of its obligation to consider the admissibility of the contents of the evidence, not the form.  While the former employee could be subpoenaed to testify at trial, eliminating the hearsay concerns currently existing, the court is reluctant to consider hearsay statements at the summary judgment stage based on the possibility the original declarant could be made available at trial.  If such were the rule, virtually all hearsay statements would be admissible in the summary judgment context, thereby eliminating any viable hearsay objections.  The court is convinced this was not the intent of the "form over content" distinction, especially in instances where the "unavailable witness" would have been available to the party merely by filing a subpoena.  Defendants' hearsay objections to Paragraph 6 of the Brague declaration are sustained.

   *B.  Exhibit Objections*

   Defendants object to Exhibits 21 and 22 of the Brague Declaration.  Brague offers Exhibit 21, identified only as an excerpt from *Vision Monday*, to demonstrate how substantial Defendants' companies are in the eye-care-services industry and to show Defendants' gross sales for the 2012 fiscal year.  Defendants argue the excerpt is hearsay and not authenticated.  The excerpt is hearsay because it is an out-of-court statement offered for the truth of the matter asserted.

   Plaintiffs assert *Vision Monday* is a self-authenticating trade magazine.  Brague describes *Vision Monday* as a "trade magazine."  However,  Brague's description is merely conclusory, providing no details on the size of the subscription base or evidence the magazine is well-known and relied on by the public.  Brague has failed to properly authenticate Exhibit 21.  Defendants' objections to the exhibit are sustained.

   Exhibit 22 is the docket report for Case No. C140528PE, *In the Matter of Donald Russell*

*Garris*. Defendants argue the docket report is hearsay and not authenticated. The docket report was generated by the Oregon Judicial Information Network ("OJIN"), a computer system that serves as the case register for every state court in Oregon. *Miller v. Baldwin* 176 Or. App. 500, 518 (2001) (Armstrong, J. dissenting). The OJIN report is an appropriate source of facts capable of being judicially noticed under Federal Rule of Evidence 201. *Christy v. Schrunk,* No. CV05-1580-HU, 2006 WL 1515549, at n.6 (D. Or. May 31, 2006). Defendants' objections to Exhibit 22 are overruled.

## II.  Gary Schulz Declaration

### A.  Declaration Objections

Defendants objects to various statements made in the Schulz Declaration based on hearsay, lack of personal knowledge, and the absence of a proper foundation. The Ninth Circuit requires affidavits offered in support of summary judgment be based on personal knowledge. *Bliesner v. The Commc'n Workers of America*, 464 F.3d 910, 915 (9th Cir. 2006). Federal Rules of Evidence 602 provides that "[a] witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." The evidence establishing personal knowledge of the matter may consist of the witness's own testimony. *Id.*

Defendants object to Paragraphs 12, 13, and 15 of the Schulz Declaration. In Paragraph 12, Schulz states he "was aware of several doctors buying and selling their practices which were subleased under Defendants' companies. These sales and purchases of practices were done with the knowledge and consent of Defendants." (Schulz Decl. ¶ 12.) Schulz has personal knowledge of his own attempts to purchase a practice. However, Schulz does not provide any information on his personal knowledge of other doctors buying and selling practices. To the extent Schulz is describing

information he obtained from other doctors, the statement is hearsay and is inadmissible for purposes of this motion.   The statement is being offered to establish Defendants' pattern of practice, not Schulz's state of mind.  Additionally, Schulz has no personal knowledge with regard to information known by Defendants or if such sales were completed with Defendants' consent.  Defendants' objections to Paragraph 12 are sustained.

In Paragraph 13, Schulz states "doctors would not hire me after speaking with Visionworks representatives" implying Defendants prevented Schulz from being hired.  (Schulz Decl. ¶ 13.)  Again, Schulz does not offer evidence establishing he has personal knowledge that Defendants' representatives told the doctors to not hire him.  To the extent Schulz obtained information from other doctors, the statements made by the other doctors would qualify as hearsay and would not be admissible.  Again, the statement is being offered to establish Defendants's pattern of practice, not Schulz's state of mind.  Defendants' objections to Paragraph 13 are sustained.

Finally, Defendants object to Paragraph 15 of the declaration, in which Schulz represents "Defendants, and their predecessors, would then return the fully executed Sublease Agreements to me." (Schulz Decl. ¶ 15.)  Schulz has personal knowledge of receiving his sublease agreement from Defendants and their predecessors each year, returning a completed renewal form for his sublease agreement to Defendants, and Defendants returning a fully executed sublease agreement to him.  Paragraph 15 of Schulz's declaration is based on personal knowledge and is therefore admissible in these summary judgment proceedings.  Defendants' objections to Paragraph 15 are overruled.

*B. Exhibit Objections*

Defendants also object to many of the Exhibits attached to the Schulz declaration.  Defendants object to Exhibits 1, 2, 3, 4, 5, 6, 8, 17, and 19, arguing the exhibits contain hearsay and

are not authenticated.  Authentication is a "condition precedent to admissibility" which is satisfied by "evidence sufficient to support a finding that the matter in question is what its proponent claims." FED. R. EVID. 901(a) (2015).  In a summary judgment motion, documents authenticated through personal knowledge must be "attached to a [declaration] that meets the requirements of [FED. R. CIV. P.] 56[(c)] and the [declarant] must be a person through whom the Exhibits could be admitted into evidence."  *Canada v. Blain's Helicopters, Inc.*, 831 F.2d 920, 925 (9th Cir. 1987).

Exhibit 1 consists of a July 13, 1990 letter Schulz received from Robert Ponzetti ("Ponzetti"), President of Eye Care Centers of America, Inc. ("Eye Care Centers"), discussing the contents of a letter from Robb Haskins, Assistant Attorney General of Oregon, which was attached.  Eye Care Centers is the predecessor to Defendants.  (Schulz Decl. ¶ 5.)  In the attached letter, Haskins expresses concerns that Eye Care Centers, doing business as Binyon's Optical ("Binyon's"), owned and operated optometric offices in the state of Oregon without the required license, which Oregon issues only to individuals.  (Schulz Decl. Ex 1 at 3-4.)  Ponzetti advised Schulz of Haskin's opinion that the "employment of a licensed optometrist to conduct an optometric practice for a corporation (other than a professional corporation) violates the laws of the State of Oregon."  (Schulz Decl. Ex 1 at 1.) Ponzetti also informed Schulz that Eye Care Centers was "exploring the possibility of restructuring its relationship with all optometrists in Oregon should such a restructuring be found to be advisable and/or required."  (Schulz Decl. Ex. 1 at 1.)

To lay the foundation for receipt of a document in evidence, the party offering the exhibit must provide the "testimony of a witness with personal knowledge of the facts who attests to the identity and due execution of the document and, where appropriate, its delivery." *United States v. Dribble*, 429 F.2d 598, 602 (9th Cir. 1970).  Here, Schulz has personal knowledge of the letter and

attachment he received in 1990.  (Schulz Decl. ¶ 3.)

Defendants also object to Exhibit 1 claiming the content of the letter is hearsay.  Plaintiffs argue the letter is not hearsay because the letter is an opposing party's statement.  Rule 801, which identifies exclusions from the hearsay rule, provides that statements by a party opponent offered against the opponent party are excluded from the hearsay rule.  FED. R. EVID. 801(d)(2).  To qualify as a statement by a party opponent under Rule 801(d)(2), the statement must be: (1) the party's own statement, in either an individual or a representative capacity; (2) one which the party has manifested an adoption or belief in its truth; or (3) made by a person authorized by the party to make a statement concerning the subject, by the party's agent or servant concerning a matter within the scope of the agency or employment during the existence of the relationship, or by a coconspirator of a party during the course in furtherance of the conspiracy.  FED. R. EVID. 801(d)(2).

The letter is a statement by a person authorized by the party to make a statement concerning the subject.  Ponzetti was President of Eye Care Centers at the time he authored the letter, and thus, qualifies as a person authorized to make a statement concerning the restructuring of optometrists in Oregon for Eye Care Centers.  As Eye Care Centers was Defendants predecessor, Ponzetti's letter qualifies as an opposing party's statement and is not hearsay.  The attached letter from Haskins provides the impetus for the restructuring and is not being offered for the truth of the contents, but for the state of mind of Ponzetti.  Exhibit 1 is admissible.  Defendants' objections are overruled.

Next, Defendants object to Exhibit 2, the Binyon's Doctor and Supervisor's Handbook ("Handbook").  The Handbook consists of various tips and procedures on how to run a successful optometry practice.  J. R. Lacey ("Lacey"), Vice President of Professional Services for Eye Care Centers, provided hundreds of pages of information to optometrists. The Handbook contains various

manuals, forms, and procedures from Lacey and Defendants. The Handbook is a statement by a party-opponent because Lacey is authorized by Defendants to send the Handbook to Schulz and other optometrists. Schulz has personal knowledge of the Handbook and can testify to receiving the Handbook and supplements to the Handbook. In addition, Exhibit 2 is properly characterized as a business record and falls within the Rule 803(6) exception to the hearsay rule. Evidence falls under the business records hearsay exception when the record was: (1) made or transmitted by an individual with personal knowledge; (2) created contemporaneously to the events discussed therein; (3) kept in the course of a regularly conducted business activity; and (4) accompanied by supporting testimony. *Clark v. City of L.A.*, 650 F.2d 1033, 1036-37 (9th Cir. 1981); FED. R. EVID. 803(6) (2015). Therefore, Exhibit 2 is admissible. Defendants' objections to Exhibit 2 are overruled.

Defendants also object to Exhibits 3 and 4, which are copies of pages obtained from the *SEC Info* website identified by Plaintiffs as certificates of incorporation. Defendants argue Exhibits 3 and 4 are hearsay and not properly authenticated. Plaintiffs contend the certificates fall under the business records hearsay exception. Plaintiffs do not meet the fourth factor of the Rule 803(6) exception, which requires supporting testimony. Plaintiffs submitted printouts from a website but have not presented any testimony to authenticate the printouts.

Additionally, Plaintiffs argue the certificates of incorporation fall under the public records hearsay exception. Under Rule 803(8), evidence falls under the public records exception if the record sets out: "(1) the office's activities; (2) a matter observed while under a legal duty to report, but not including, in a criminal case, a matter observed by law-enforcement personnel; or (3) in a civil case or against the government in a criminal case, factual findings from a legally authorized investigation" and the opponent does not establish a lack of trustworthiness. FED. R. EVID. 803(8)

(2015). Exhibits 3 and 4 are printouts from the website *SEC Info*, which is not affiliated with or endorsed by the Securities and Exchange Commission. Exhibits 3 and 4 do not fall under the public records exception, or any other hearsay exception, and are therefore not admissible. Defendants' objections are overruled.

Next, Defendants object to Exhibits 5 and 6, claiming they are not properly authenticated and are hearsay. Exhibit 5 is an update to the human resources section of the Handbook provided by to Schulz by Lacey.[3] Exhibit 6 is a bulletin sent by Mary Gary ("Gary"), Eye Care Centers' Manager of Professional Services, notifying all Eye Care Centers optometrists of the chance to purchase equipment utilizing Eye Care Centers' buying power. As with previous exhibits, Exhibits 5 and 6 are properly authenticated and are not hearsay. The exhibits were provided by managers of Defendants, who appear to be authorized to send the updated section of the Handbook and the bulletin, and are admissible as a statement by a party opponent or a business record. Defendants' objections are sustained.

Exhibit 8 is a copy of the 2012-2013 sublease for Schulz's optometry practice. Exhibit 8 is properly authenticated because Schulz has personal knowledge of the sublease agreement: it was sent to him personally and he had received this type of agreement on an annual basis since 1990. The sublease agreement is not hearsay because it is a business record. The sublease agreement is also not hearsay because Gary, as manager of Defendants, was authorized to send sublease agreements to optometrists like Schulz. Thus, it is a statement by a party opponent. Exhibit 8 is admissible. Defendants' objections are overruled.

Defendants object to Exhibits 17 and 19, arguing hearsay and lack of authentication. Exhibit

---

[3]Lacey is identified in Exhibit 5 as the Chairman of the Doctor Advisory Panel.

17 consists of emails from 2009 between Schulz, Gary, and Karen Villanueva ("Villanueva"), Eye

Care Centers' Director of Marketing, Creative Services, discussing a toll free number for Binyon's

stores in the Portland area.  These emails have been properly authenticated because Schulz has

personal knowledge of sending and receiving these emails from Gary and Villanueva.  In addition,

the emails are excluded from hearsay because it is an opposing party's statement.  At the time of the

emails, Gary and Villanueva were authorized by Defendants to answer optometrist's questions and

were acting within the scope of their employment. Therefore, the emails are not hearsay and are

admissible.  Defendants' objections are overruled.

Finally, Exhibit 19 is another email communication in 2013 between Schulz and an agent of

Defendants, specifically, Gaylyn Rockwood ("Rockwood"), Visionary's Manager of Professional

Services.  Rockwood's email provides Schulz a form which served as an application to purchase

Garris's practice.  The email is authenticated because Schulz has personal knowledge of the email

exchange, and the email is not hearsay because Rockwood's correspondence is an opposing party's

statement excluded from hearsay.  Exhibit 19 is admissible.  Defendants' objections are overruled.

II.  Justine Garris Declaration

    *A.  Declaration Objections*

Justine Garris ("Justine"), Garris's daughter, worked for Garris beginning in 2003 and was

office manager for his optometry practice from 2008 to 2013.  (J. Garris Decl. ¶ 3.)  Defendants

object to many of the statements made in Justine's declaration, arguing Justine lacks personal

knowledge and the statements are hearsay.

In Paragraph 4 of Justine's declaration, Justine claims she was told by Defendant's District/

Territory Manager Michael Constancio ("Constancio"), that Garris's sublease agreement would be

renewed and the office had nothing to worry about. (J. Garris Decl. ¶ 4.) Justine appears to have personal knowledge of the event because she was the office manager of Garris's practice during the time and would likely have interactions with Defendants' managers in this capacity. In addition, the statements made by Constancio are not considered hearsay because the statements qualify as an opposing party's statement. Constancio's position as District/Territory Manager would give him the authority and discretion to discuss sublease agreements with optometrists. The statement is admissible because Justine has personal knowledge of the statement and the statement by Constancio is not hearsay because the statement is an opposing party's statement. Defendants' objections are overruled.

Next, Defendants argue the statement that "[i]n August 2013, Dr. Garris attempted to sell his practice to Dr. Schulz, which Defendants would not allow" in Paragraph 5 is hearsay and Justine lacks personal knowledge. (J. Garris Decl. ¶ 5.) As office manager, Justine would have personal knowledge of Garris's attempt to sell his practice to Schulz. However, Justine does not have personal knowledge of Defendants' decision-making process with regard to Garris's desire to sell his practice. Justine does not provide any other evidence that Defendants disallowed Garris to sell his practice. The specific statement that "Defendants would not allow" Garris to sell his practice is conclusory, hearsay and not admissible. Defendants' objections are sustained.

Defendants also object to Paragraph 10 of Justine's declaration. In Paragraph 10, Justine states Defendants did not provide Garris with thirty days' written notice of the cancellation of his sublease agreement. (J. Garris Decl. ¶ 10.) Justine also reports Defendants provided less than seven days for Garris to vacate the premises. Justine has personal knowledge of this situation because, as office manager, she would be aware when the sublease agreement was cancelled and when Garris's

practice needed to vacate the premises.  Defendants' objections are overruled.

Defendants object to the first sentence in Paragraph 11 of Justine's declaration, in which she claims "Defendant HVHC regularly monitored, interacted, provided clinical practice advice, and management to Plaintiffs."  (J. Garris Decl. ¶ 11.)  Defendants argue Justine lacks personal knowledge and the statement is hearsay.   Justine was office manager for Garris's practice from 2008-2013 and would have personal knowledge of any materials, letters, or forms sent by Defendants to  Garris's office.  Any  items received by Garris and his practice from Defendants would not be hearsay because the handbooks and guides would be opposing party statements, or business records, or both.  Justine would also be able to provide direct testimony admissible at trial pertaining to Defendants' interactions with herself and Dr. Garris.  Paragraph 11 of Justine's declaration is admissible.  Defendants' objections are overruled.

Next, Defendants object to Paragraph 12 of Justine's declaration.  Justine states "District/Territory Manager Lori Kerr told myself and Dr. Garris that he needed to do better on recalls and taking care of walk-in patients and linked that performance to the renewal of the Sublease Agreement." (J. Garris Decl. ¶ 12.) Justine indicates she was personally told and witnessed Garris be given instructions on doing better for recalls and walk-in patients by Lori Kerr ("Kerr") establishing personal knowledge.  In addition, Paragraph 12 is not hearsay because the statement is excepted under Rule 801(d) as a opposing party's statement.  Kerr, as District/Territory Manager, would be authorized to speak for Defendants and inform optometrists about Defendant's concerns. The statement is not hearsay and is therefore admissible.  Defendants' objections are overruled.

Finally, Defendants object to Paragraph 13 of Justine's declaration.  In Paragraph 13, Justine represents Constancio told Garris to walk his patients out to retail sales people and hand them off

and that failure to do so might result in non-renewal of Garris's sublease. (J. Garris Decl. ¶ 13.) As previously mentioned, Constancio is a District/Territory Manager and likely has authority to inform optometrists about their duties, such as walking patients out and handing them off to retail sales people. Accordingly, the statements are those of a party opponent and not hearsay. To the extent Justine has personal knowledge of interactions between Garris and District/Territory Managers, the content of Paragraph 13 is admissible. Defendants' objections are overruled.

B. *Exhibit Objections*

Defendants argue many of the exhibits attached to Justine's declaration are not properly authenticated and are hearsay. First, Defendants object to Exhibit 9, which is an email between Justine and Joe Neron ("Neron"), another optometrist who subleases from Defendants, discussing how to sell an optometry practice. Exhibit 9 is properly authenticated because Justine has personal knowledge of the email between her and Neron. However, Exhibit 9 is hearsay because the email is an out-of-court statement offered for the truth of the matter asserted. Exhibit 9 is inadmissible. Defendants' objections are sustained.

Next, Defendants object to Exhibit 10. Exhibit 10 is email correspondence between Justine and Neron in which Justine seeks Neron's assistance in finding optometrists to cover Garris's practice. While Exhibit 10 is properly authenticated because Justine has personal knowledge as the author of the email to Neron, the statements made by Neron in his response are hearsay and inadmissible for the purposes of this motion. Defendants' objections are sustained.

Defendants also object to Exhibit 15. Exhibit 15 is an email sent by Dr. Florian Safner, HVHC's Vice President of Professional Services ("Safner"), to Garris providing the "2nd Quarter Insights", expressing an desire to keep Garris connected with Defendants, and seeking stories to

share with the company.  This email is properly authenticated based on Justine's personal knowledge, as office manager, of emails sent to Garris's practice.  Exhibit 15 is not hearsay because it is an opposing party's statement by an authorized representative of Defendants. Safner, as the Vice President of Professional Services, would be authorized to send emails discussing Defendants financial performance and desire to continue a relationship with Garris.  Exhibit 15 is admissible.[4] Defendants' objections are overruled.

Finally, Defendants object to Exhibit 16.  Exhibit 16 consists of a letter and sublease agreement sent from Rockwood to Garris covering the period of June 1, 2013, to May 31, 2014. Defendants argue Exhibit 16 is not authenticated, and the letter and sublease agreement are hearsay. Exhibit 16 is properly authenticated because Justine would have access to this letter as the office manager for Garris's practice at the time.  In addition, Exhibit 16 is not hearsay because the letter and sublease agreement are both a business record and an opposing party's statement made by a person authorized to make a statement on the matter.  Rockwood was the Manager of Professional Services at the time and had the authority to send sublease renewals to optometrists.  In addition, Jeff Smith ("Smith"), Medical Director of Visionary, initialed and signed the sublease agreement. Exhibit 16 is admissible and Defendants' objections overruled.

IV.  Stephanie Garris Declaration

A.  Declaration Objections

Defendants also raise objections to many of the statements found in the declaration of

---

[4]Plaintiffs move to strike Defendants' additional objection to Exhibit 15.  Defendants objected to both an Exhibit 15 email and an Exhibit 15 letter. The only Exhibit 15 is an email and as previously discussed is admissible.  Plaintiffs' request to strike Defendants' additional objection to Exhibit 15 is granted.

Stephanie Garris ("Mrs. Garris").  Mrs. Garris was the wife of Garris, the Corporate Secretary for Donald R. Garris, O.D., P.C., and is the Personal Representative for the Garris Estate.  (S. Garris Decl. ¶ 3.)  Defendants' various objections assert Mrs. Garris lacks personal knowledge and her statements are hearsay.

First, Defendants object to Paragraph 4 which states: "[i]n May 2013, District/Territory Manager Michael Constancio confirmed that the Sublease Agreement for the Lloyd Center Mall location would be renewed, that Garris had nothing to worry about, and that everything was fine." (S. Garris Decl. ¶ 3.)  Unlike Justine, who as office manager of her father's practice clearly was involved in the day-to-day operations of the practice, nothing in the record supports a similar inference for Mrs. Garris.  The representations in her declaration imply she acquired her knowledge as Dr. Garris's wife rather than as Corporate Secretary or from some other corporate role.  To the extent Mrs. Garris obtained the information solely through her husband, she lacks personal knowledge.  Defendants' objections are sustained.

Defendants also object to Paragraph 5 in which Mrs. Garris claims "Defendants would not allow" Garris to sell his practice to Schulz.  (S. Garris Decl. ¶ 5.)  Defendants argue Mrs. Garris lacks personal knowledge and the statement is hearsay.  Once again, nothing in the declaration illustrates how Mrs. Garris had personal knowledge of Defendants' actions in blocking Garris from selling his practice.  The statement lacks foundation and is inadmissible.  Defendants' objections are sustained.

Next, Defendants object to Paragraph 8 which states: "Defendant HVHC, by and through its Vice President Dr. Florian Safner, responded directly to me on behalf of HVHC and all of its affiliated companies." (S. Garris Decl. ¶ 8.)  Again, Defendants argue this statement by Mrs. Garris

is hearsay and she lacks personal knowledge.  Mrs. Garris has personal knowledge because she personally received the letter from Safner.  In addition, this statement is not hearsay because Safner is a party authorized by Defendants to make statements concerning subleases.  Safner's statements are an opposing party's statement and are, therefore, not hearsay.  Defendants' objections are overruled.

Defendants also object to Paragraph 9 which states: "Dr. Garris was not in default of his sublease agreement and was operating his practice in accordance with Defendants' policies and practices." (S. Garris Decl. ¶ 9.)  Again, Defendants argue Mrs. Garris lacks personal knowledge and the statement is hearsay.  Mrs. Garris was the Corporate Secretary for Donald R. Garris, O.D., P.C. and stated she is knowledgeable about Garris's optometry practice.  (S. Garris Decl. ¶ 3.) However, Mrs. Garris provides no foundation to establish her personal knowledge with regard to Garris's practice activities.  Paragraph 9 of Mrs. Garris's declaration is inadmissible.  Defendants' objections are sustained.

Defendants object to Mrs. Garris's statement that  "[n]either Dr. Garris , nor myself as Corporate Secretary, provided any written notice to Defendants to mutually cancel his sublease . . ." found in Paragraph 10.  (S. Garris Decl. ¶ 10.)  Mrs. Garris would have personal knowledge of her own actions with regard to cancellation of the sublease agreement.  However, Mrs. Garris does not specify how she knows Garris did not provide written notice of such  cancellation.  To the extent Garris told Mrs. Garris of his actions, it would be hearsay and would not fall under any hearsay exceptions.  Accordingly, Paragraph 10 is admissible only with regard to Mrs. Garris's actions. Defendants' objections are sustained in part.

Finally, Defendants object to Paragraph 12 which states "Defendants advertised and

promoted their company brands, and Garris was a direct beneficiary of, and a required participant, in those advertisements." (S. Garris Decl. ¶ 12.)  Mrs. Garris, as Corporate Secretary of Garris's practice, would likely have access to the Handbooks and other materials Defendants sent to optometrists.  Accordingly, it is reasonable Mrs. Garris would have personal knowledge of the requirements and recommendations Defendants gave to their optometrists.  In addition, the materials sent by Defendants would not be hearsay because it would be an opposing party's statement.  This statement is admissible.  Defendants' objections are overruled.

### B. Exhibit Objections

In addition to objecting to various statements in Mrs. Garris's declaration, Defendants argue Exhibits 12, 13, and 18 lack proper authentication and are hearsay.  Exhibit 12 consists of an email sent by Garris to Constancio expressing his concerns regarding his sublease termination.  Mrs. Garris claimed she "knew and read the email Dr. Garris wrote to Michael Constancio concerning the refusal of Defendants to allow the sale of his practice to Dr. Schulz." (S. Garris Decl. ¶ 6.)  Mrs. Garris's declaration shows her personal knowledge of the email in Exhibit 12.  Exhibit 12 is properly authenticated.  However, Exhibit 12 is hearsay that does not fall under a hearsay exception.  Plaintiffs argue Garris's email would fall under Rule 803(3) exception for then-existing mental, emotional, or physical conditions.  The Rule 803(3) hearsay exception does "not include a statement of memory or belief to prove the fact remembered or believed unless it relates to the validity or terms of the declarant's will." FED. R. EVID. 803(3).  In Exhibit 12, Garris discusses his feelings of distress and how he would have acted differently if he knew other facts. The statements made in the email by Garris are statements of memory and belief that do not relate to his will.  Exhibit 12 is hearsay and does not fall under any applicable exceptions, and thus is inadmissible.  Defendants' objections

are overruled.

Defendants also object to Exhibit 13 – an email sent by Mrs. Garris to Rockwood raising various concerns she had regarding Garris's sublease termination and Defendants' intent.  Mrs. Garris personally wrote this email and has personal knowledge of the information in Exhibit 13.  In the email, Mrs. Garris generally refers to the statements and feelings of her family members, of Schulz's impressions of contacts with Defendants regarding his desire to purchase Garris's practice, and representations, comments, and assurances made by Defendants.  Defendants' statements are statements of a party opponent and are not hearsay.  However, Mrs. Garris's recounting of statements made by her relatives and Schulz are hearsay.  For the purposes of this motion, the court will consider only the statements of Mrs. Garris and Defendants found in Exhibit 13.  Defendants' objections are sustained in part.

Finally, Defendants object to Exhibit 18, the original 1991 sublease agreement between Defendants' predecessors and Garris.  Exhibit 18 is not hearsay because the sublease agreement is an opposing party's statement and a business record.  The sublease agreement discusses the responsibilities of each party and is signed by an Eye Care Centers representative and Garris.  Robert Gross ("Gross"), then Senior Vice President of Operations for Eye Care Centers, was authorized by Defendants to enter into sublease agreements with optometrists.  Exhibit 18 is not hearsay and is therefore admissible.  Defendants' objections are overruled.

V.  Mary Gary Declaration

The final evidentiary objections Defendants raise are to statements made in Gary's declaration.  Defendants argue Gary, former Manager of Professional Services for Defendants, lacks personal knowledge and the statements are hearsay.  First, Defendants object to Paragraph 4 which

states "the decision to not renew a subleasing doctor's lease was made by HVHC/Visionworks of America, Inc." (Gary Decl. ¶ 4.) Gary has personal knowledge of Defendants' decisions with regard to the renewal of subleases for doctors as a manager for Visionary who sent sublease renewals to Schulz and other optometrists. To the extent Gary is relying on her experience, and not statements from others, the statement is not hearsay. Paragraph 4 is admissible. Defendants' objections are overruled.

Next, Defendants object to Paragraph 6 of Gary's declaration which states "Visionary Properties, Inc., HVHC, and its related entities, including Visionworks of America, Inc., knew that subleasing optometrists bought and sold their practices." (Gary Decl. ¶ 6.) Once again, Gary would have personal knowledge of Defendants' experience with, and involvement in, optometrists buying and selling practices. Gary, as Manager of Professional Services, would be aware of changes in optometrists practices. The statement is not hearsay because Gary can testify regarding her understanding of the procedures optometrists utilized to buy or sell practices with Defendants' knowledge. Defendants' objections are overruled.

Finally, Defendants object to Paragraph 7 which states "HVHC and its related entities, including Visionworks of America, Inc., employed District or Territory Managers who supervised the retail operations of Visionworks stores and would check in on subleasing optometrists." (Gary Decl. ¶ 7.) Gary has personal knowledge of Defendants' employment of District/Territory Managers and their supervisory responsibilities with regard to the retail operations of Defendants' stores. Accordingly, to the extent Gary is testifying to her own knowledge of the procedures created by Defendants for District/ Territory Managers to oversee optometrists, the statement is not hearsay and is admissible. Defendants' objections are overruled.

*Background*

Plaintiffs are optometrists who, prior to 1990, were employees of Eye Care Centers working in Binyon's retail eyewear stores.  (Schulz Decl. ¶¶ 3, 4.)  In a letter dated May 29, 1990, the Oregon Department of Justice advised Eye Care Centers the State licenses only individuals to practice optometry, thereby preventing Eye Care Centers from hiring optometrists to provide optometric services to the public at Binyon's stores.  (Schulz Decl. Ex. 1 at 3-4.)  The letter explained:

> a licensed optometrist can contract with an unlicensed person, including a corporation, to manage the licensed optometrist's accounting, collection, advertising or other business matters of the optometrist's business.  However, an optometrist may not contract with an unlicensed business to perform optometric services for the unlicensed business.

(Schulz Decl. Ex. 1 at 3-4.)  Ponzetti forwarded the letter to Schulz in July 1990, advising him Eye Care Centers were researching an alternative to the existing relationship with optometrists in Oregon, if such was found to be necessary.   (Schulz Decl. Ex. 1 at 1.)  Subsequently, Eye Care Centers directed its optometrists to form professional corporations and transitioned them from employees to tenants leasing space from Eye Care Centers in Binyon's stores.  (Schulz Decl. ¶¶ 3-5.)

After 1990, Eye Care Centers "continued to direct and control the practice management, personnel management, accounting, business principals, marketing, patient management, supply ordering, and other facets" of the new optometric practices.  (Schulz Decl. ¶ 4; J. Garris Decl. ¶ 11.) Eye Care Centers set up pricing with vendors.  For example, in January 1998, Eye Care Centers provided information on a direct purchase program with a medical equipment vendor which offered lower prices to subleasing optometrists on specific products and service agreements purchased from the vendor. (Schulz Decl. ¶ 7; Ex. 6.)  Eye Care Centers regularly updated the Handbook provided to its optometrists.  For example, in July 1995, Eye Care Centers forwarded a chapter covering

"Hiring, Orientation, and Performance Appraisal suggested for the practicing optometrist's office" to all subleasing optometrists for inclusion in the human resources section of the Practice Management Manual.  (Schulz Decl. ¶ 7; Ex. 5.)  Eye Care Centers employed District and Territory Managers, who supervised the retail portion of Binyon's stores, obtained information about the optometrists from the store managers and, on occasion, provided direction to optometrists.  (Schulz Decl. ¶ 8; Gary Decl. ¶ 7.)  For example,  Kerr told Garris he needed to improve on recalls and taking care of walk-in patients while Constancio directed Garris to personally hand his patients off to the retail salespeople.  (J. Garris Decl. ¶¶ 12, 13.)  Both advised Garris his response to these admonitions may affect the renewal of his sublease.  (J. Garris. Decl. ¶¶ 12, 13.)  Finally, Eye Care Centers required optometrists to name Eye Care Centers as an additional insured on commercial liability policies, provide monthly reports on the number of patients and gross sales, and participate in its advertisement and promotion of Defendants optometry services.  (Schulz Decl. ¶¶ 7, 14; S. Garris Decl. ¶ 12.)

In the fall of 1997, optometrists no longer subleased space from Eye Care Centers but, rather, a related entity known as Visionary.  (Schulz Decl. ¶ 6.)  Visionary is a subsidiary of Visionworks of America, Inc. ("Visionworks"), which is, in turn, a subsidiary of HVHC.  ((Schulz Decl. ¶ 6; Enterline Decl. ¶ 4.)  HVHC, a subsidiary of Highmark Inc., is a holding company incorporated in Delaware and headquartered in Texas.  (Enterline Decl. ¶¶ 2, 3.)  HVHC, which engages in only limited operations, has never conducted operations, or had employees or offices, in Oregon or Washington.  (Enterline Decl. ¶¶ 3, 5, 6.)  HVHC was not a party to the sublease agreements between Visionary and Schulz or Donald R. Garris, O.D., P.C. ("Garris PC.").  (Enterline Decl. ¶¶ 7-9; Latham-Rockwood Decl. Exs. 1, 2.)

I.  Schulz Sublease

From 1990 to April 1, 2011, Eye Care Centers, and then Visionary, renewed Schulz's sublease annually.  (Schulz Decl. ¶ 9.)  On April 1, 2011, Schulz and Visionary again entered into a sublease agreement for premises located in the Columbia Tech Center in Vancouver, Washington, where Schulz operated his optometry practice, for the one-year period from April 1, 2011, to March 31, 2012 (the "Schulz Sublease"). (Latham-Rockwood Decl. ¶ 2.)   The Schulz Sublease was for a defined one-year term and did not contain language regarding renewal.  (Latham-Rockwood Decl. Ex. 1 at 1; Gary Decl. ¶ 5.)

The Schulz Sublease limited Schulz's use of the premises exclusively to "the practice of optometry, which practice shall not include . . . the direct or indirect selling of eyeglass frames, or sunglasses, or eyeglass lenses at the Subleased Premises," but allowed Schulz, to the extent permitted by law, to fit and sell contact lenses and supplies. (Latham-Rockwood Decl. Ex. 1 at 1.) Additionally, the Schulz Sublease required Schulz to make fixed monthly rental payments on or before the first of each month and provide a monthly statement, on a form provided by Visionary, of examinations performed and gross sales received by Schulz per day on or before the tenth of each month.  (Latham-Rockwood Decl. Ex. 1 at 4.)  "Gross Sales" was defined as:

> the entire amount of the sales price or fee charged, whether for cash or otherwise, of all sales of merchandise, services, contact lens service agreements or insurance, and other receipts whatsoever of all business conducted in and from the Subleased Premises, including any fees paid to Sublessee for consulting services, and refractive surgery co-management services, mail or telephone orders received or filled at the Subleased Premises, deposits not refunded to purchasers, and sales to employees.

(Latham-Rockwood Decl. Ex. 1 at 4.)[5]

_____

[5]It appears the monthly report was required to allow Visionary the ability to confirm the accuracy of rental payments based on a percentage of gross sales.  While not necessarily applicable

The Schulz Sublease also contained the following provisions:

Section 7.5.    Relationship of Parties.    Nothing herein contained shall be deemed or construed by the parties hereto, nor by any third party, as creating the relationship of principal and agent or of partnership or of joint venture between the parties hereto, or as creating any relationship between the parties hereto other than the relationship of Sublessor and Sublessee.

\* \* \*

**Section 7.13.  Limitations of Damages. SUBLESSEE AND SUBLESSOR MUTUALLY AGREE THAT THEY SHALL NOT BE LIABLE TO THE OTHER FOR CONSEQUENTIAL, INDIRECT, INCIDENTAL, SPECIAL, PUNITIVE, OR ANY OTHER NON-DIRECT DAMAGES INCLUDING, WITHOUT LIMITATION, LOST PROFITS OR FUTURE REVENUES, COST OF CAPITAL, LOSS OF BUSINESS REPUTATION OR OPPORTUNITY OR ANY CLAIM OR DEMAND AGAINST THE OTHER PARTY BY ANY THIRD PARTY, HOWEVER CAUSED, WHETHER UNDER THEORY OF CONTRACT, TORT (INCLUDING NEGLIGENCE), STATUTE OR OTHERWISE, EVEN IF THE PARTY HAS BEEN ADVISED ON THE POSSIBILITY OF SUCH DAMAGES. SUBLESSOR'S LIABILITY UNDER THIS SUBLEASE OR OTHERWISE ARISING OUT OF THIS SUBLEASE REGARDLESS OF THE FORM OF ACTION, WHETHER UNDER THEORY OF CONTRACT, TORT (INCLUDING NEGLIGENCE), STATUTE OR OTHERWISE, SHALL NOT EXCEED AN AMOUNT EQUAL TO THE TOTAL AMOUNT PAID OR PAYABLE BY SUBLESSEE TO SUBLESSOR UNDER THIS SUBLEASE.    THE PARTIES' ENTIRE LIABILITY FOR ANY CLAIMS BY THE OTHER PARTY, REGARDLESS OF THE BASIS, IS SET FORTH IN THIS SECTION.**

\* \* \*

Section 7.15.  Governing Law.  This Sublease shall be construed pursuant to the laws of the state in which the Subleased Premises are located.

\* \* \*

Section 7.18.  Prior Agreements Superseded.  This Sublease constitutes the sole and only agreement of the parties hereto and supersedes any prior understandings or written or oral agreements between the parties with respect to the

---

to rent due under the Schulz Sublease, Schulz was still obligated to provide the monthly reports to Visionary.

subject matter within.

* * *

     <u>Section 7.19.</u>  <u>No Amendment.</u>  This Sublease may not be amended or otherwise changed except by an agreement in writing signed by the Sublessor and Sublessee.

(Latham-Rockwood Decl. Exs. 1 at 7-9.)  Schulz represents Defendants inserted the limitation of

damages clause in the ordinary course of business without providing notice or an explanation of the

change.  (Schulz Decl. ¶ 15.)  Schulz did not have an opportunity to negotiate the terms of the

sublease agreement but was expected to execute the sublease agreement on a "take-it-or-leave-it

basis."  (Schulz Decl. ¶ 15.)

     On January 16, 2012, Gary forwarded to Schulz copies of a new sublease, to commence on

April 1, 2012, along with a supply of the "Doctor's Monthly Sales Forms," mailing labels for rent

payments, a prescription pad, and business card re-order forms.  (Schulz Decl. Ex. 8.)  Gary asked

Schulz to examine the documents, confirm the equipment listed, initial and signed the documents

where appropriate, and return all copies to her within two weeks of receipt, along with copies of

insurance certificates verifying the existence of Professional Liability and Comprehensive General

Liability coverage, and Schulz's current optometric license renewal certificate.  Gary advised that

on receipt of properly executed documents, she would submit them to Dr. Smith and, upon

execution, return a fully executed original to Schulz.  (Schulz Decl. Ex. 8 at 1.)  The parties did not

enter into a new sublease agreement upon the termination of the Schulz Sublease.  (Latham-

Rockwood Decl. ¶ 3.)  HVHC and Visionworks generally made the decision to not renew an

optometrist's sublease.  (Gary Decl. ¶ 4.)

/ / / / /

II.  Garris Sublease

In May 2013, Constancio advised Justine that Garris PC's sublease for a location in Lloyd Center Mall, Portland, Oregon, where Garris operated his optometry practice, would be renewed, Garris PC had nothing to worry about, and everything was fine.  (J. Garris Decl. ¶ 4.)  Shortly thereafter, Garris PC and Visionary entered into a sublease agreement for the Lloyd Center premises for the one-year period from June 1, 2013, to May 31, 2014 (the "Garris Sublease").  (Latham-Rockwood Decl. ¶ 6.)  The Garris Sublease contained terms virtually identical to those in the Schulz Sublease[6] with the exception of the following language, which was found only in the Garris Sublease:  "Notwithstanding any provision to the contrary, this sublease is specifically cancelable for any reason by either party giving thirty (30) days written notice to such effect to the other party at the address specified herein."  (Latham-Rockwood Decl. Ex. 2.)

In early August, 2013, Justine informed Rockwood of Garris's cancer diagnosis and resulting inability to continue his optometry practice.  (Latham-Rockwood Decl. ¶ 7.)  Rockwood represents Justine requested early termination of the Garris Sublease at this time and that Visionary agreed to waive the monthly rental payment and thirty-day notice of termination obligations under the Garris Sublease.  (Latham-Rockwood Decl. ¶¶ 7, 8.)  Justine denies this, stating she communicated to Visionary a desire to sell Garris's practice to another optometrist.  (J. Garris Decl. ¶ 5.)  To this end, Justine attempted to find a possible buyer and sought information and advice from Dr. Heron, who had recently purchased a Visionwork's optometry practice.  (J. Garris Decl. ¶ 5.)  Visionary was aware subleasing optometrists bought and sold their practices, which sale did not include the

---

[6]The Garris Sublease did not have language referencing a sublessee's obligation to pay rent based on a percent of gross sales.

premises or the equipment located thereon.  (Gary Decl. ¶ 6.)

Schulz expressed to Visionary an interest in assuming the Garris Sublease.  In mid-August 2013, Schulz completed a Sublease Agreement – General Information Form and forwarded the completed form, and a copy of his resume, to Rockwood for presentation to the Sublease Management Committee for approval.  (Schulz Decl. ¶ 13; Ex. 19.)  Visionary never acted on Schulz's request.  (Schulz Decl. ¶ 13.)

Justine continued to look for optometrists to fill in for Garris while he received cancer treatments.  (J. Garris. ¶ 6.)  In a letter dated October 23, 2013, Rockwood advised Garris PC that Visionary had found a new subtenant for the Lloyd Center Mall premises and Garris PC was released from the Garris Sublease effective November 1, 2013.  (Latham-Rockwood Decl. ¶ 10.)  The October 23, 2013 letter read:

> After conversations with your family members over the last eight weeks, we understand that you desire to terminate the above-captioned Sublease Agreement due to health-related issues.  Visionary Properties, Inc., agreed to waive your monthly rent payments until we found a new sublessee, at which time we would relinquish you from your obligations to the Sublease Agreement.
>
> This letter is to inform you that Visionary Properties, Inc. will be entering a new Sublease Agreement effective November 1, 2013[,] with another optometrist.  Accordingly, please make arrangements to remove all personal belongings from the subleased premises by the end of the day on November 10, 2013.  Michael Constancio, the Territory Director in the State of Oregon, acting on behalf of Visionary Properties, Inc., will be contacting you to arrange a mutually convenient time to meet with you, or a representative of your practice, to conduct a final walk through of the premises.
>
> Thank  you for your many years of subleasing partnership, which has truly been appreciated.  We wish you and your family all the best.

(Latham-Rockwood Decl. Ex. 3.)  Garris PC did not pay rent for August, September, or October 2013.  (Latham-Rockwood Decl. ¶ 9.)

On November 3, 2012, Mrs. Garris emailed various members of Visionary's management expressing dissatisfaction with Visionary's handling of the termination of the Garris Sublease and the short two-weeks notice to remove Garris's personal items. (S. Garris. Ex. 13.) Mrs. Garris complained about a comment made by Constancio – that November 1 would be the happiest day of Garris's life – describing it as both insensitive and unprofessional. (S. Garris. Ex. 13.) Safner responded with the following letter dated November 13, 2013:

> I would like to take this opportunity to response on behalf of Visionworks, and its affiliated companies, to your email of November 3. First, I am very sorry about the health problems confronting your husband. I can understand your concern over the situation. As reflected in Gaylyn's letter of October 23, we had been in touch with your daughters regarding the sublease between Visionary Properties and your husband. From our perspective, we clearly understood that we had reached an agreement with your daughters under which Visionary Properties waived the rent payments while we looked for a new tenant. When we found a suitable tenant, we sent our letter providing official notice that your husband was being released from the sublease. I apologize if there was a misunderstanding, but we believe our action was consistent with this agreement.
>
> I understand that much of your husband's property has been removed, but that some items remain. Some property is in the doctor's office and some property has been temporarily stored with our permission in a break room in our retail store. Please ensure that these items are removed by November 30.
>
> Thank you for your cooperation.

(S. Garris. Ex. 14.)

*Legal Standards*

Summary judgment is appropriate where the "movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a) (2013). Summary judgment is not proper if material factual issues exist for trial. *Warren v. City of Carlsbad*, 58 F.3d 439, 441 (9th Cir. 1995).

The moving party has the burden of establishing the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). If the moving party shows the absence of a genuine issue of material fact, the nonmoving party must go beyond the pleadings and identify facts which show a genuine issue for trial. *Id*. at 324. A nonmoving party cannot defeat summary judgment by relying on the allegations in the complaint, or with unsupported conjecture or conclusory statements. *Hernandez v. Spacelabs Medical, Inc.*, 343 F.3d 1107, 1112 (9th Cir. 2003). Thus, summary judgment should be entered against "a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

The court must view the evidence in the light most favorable to the nonmoving party. *Bell v. Cameron Meadows Land Co.*, 669 F.2d 1278, 1284 (9th Cir. 1982). All reasonable doubt as to the existence of a genuine issue of fact should be resolved against the moving party. *Hector v. Wiens*, 533 F.2d 429, 432 (9th Cir. 1976). Where different ultimate inferences may be drawn, summary judgment is inappropriate. *Sankovich v. Life Ins. Co. of North America*, 638 F.2d 136, 140 (9th Cir. 1981).

However, deference to the nonmoving party has limits. A party asserting that a fact cannot be true or is genuinely disputed must support the assertion with admissible evidence. FED. R. CIV. P. 56(c) (2013). The "mere existence of a scintilla of evidence in support of the [party's] position [is] insufficient." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986). Therefore, where "the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial." *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (internal quotations marks omitted).

*Discussion*

I.  Breach of Contract

   *A.  Schulz*

Defendants move for summary judgment on Schulz's breach of contract claim arguing the only contract between the parties was the Schulz Sublease which, by its terms, terminated on March 31, 2012.  Schulz does not argue Defendants breached the terms of the Schulz Sublease but, rather, breached a contract created by Defendants' representations to Schulz and his reliance thereon.

In Washington,[7] "[a] breach of contract is actionable only if the contract imposes a duty, the duty is breached, and the breach proximately causes damage to the claimant."  *Nw. Indep. Forest Mfrs. Vv. Dep't of Labor and Indus.*, 78 Wash. App. 707, 712 (1995).   A valid contract requires a meeting of the mind on essential terms, which is determined by the objective manifestations of the parties.  *Evan & Son, Inc. v. City of Yakima*, 136 Wash App 471, 475-76 (2006); *Hearst Comm'ns, Inc. v. Seattle Times Co.*, 154 Wash. 2d 493, 503 (2005).   When the parties have entered into a written agreement setting forth their duties, parol or "extrinsic" evidence is considered only where the written agreement does not express all terms agreed upon, and only to the extent such additional terms are not inconsistent with the written terms.  *Emrich v. Connell*, 105 Wash. 2d 551, 556 (1986).

Schulz alleges in the complaint Defendants created a contract with him when they convinced him to relocate to Washington in March 2009 based on promises of patient recommendations and bookings in exchange for continued good performance, and upon representations he would continue in the Washington store absent a reasonable basis or good cause to terminate the relationship.  Schulz

---

[7]As the premises covered by the Schulz Sublease is in Washington, Washington law governs claims relating to the Schulz Sublease, according to the express provisions of the Schulz Sublease.

provided no evidence establishing Defendants made any such promises or representations.  Schulz may not rely on unsupported allegations in his complaint to defeat a summary judgment motion.

In the opposition briefing, Schulz asserts Defendants' provision of operating manuals, reporting requirements, supplier and vendor relationships, and managerial oversight establish a course of conduct which modified the terms of the Schulz Sublease.  These general actions provide no evidence of an agreement to renew the Schulz Sublease made in, or even implied from, Schulz's relationship with Defendants, and Schulz has failed to reference specific evidence of such agreement. Furthermore, the Schulz Sublease specifically provides it supercedes any prior understandings or agreements between the parties and any modifications must be made in writing.

Schulz has failed to offer evidence of the existence of an oral contract between himself and Defendants or of conduct modifying the Schulz Sublease.  The Schulz Sublease terminated on March 31, 2012, and did not create obligate Defendants to renew the sublease. Defendants are entitled to summary judgment on Schulz's claim for breach of contract.

### B.  Garris

Defendants seek summary judgment on Garris's breach of contract claim, asserting the Garris Sublease was terminated by mutual agreement, no obligation existed to assist Garris in selling his practice, and Garris lacks standing to enforce the Garris Sublease, as the Garris Sublease was between Visionary and Garris PC, not Garris individually.  Garris contends Defendants' conduct created a contract to renew the Garris Sublease indefinitely, which it breached when it termed the Garris Sublease in November 2013.  Garris also argues Defendants breached the terms of the Sublease Agreement by failing to provide thirty days' notice of the termination or provide assistance in finding a buyer for Garris's practice.  Finally, Garris asserts the administrative dissolution of

Garris PC before the filing of the action and the substitution of Mrs. Garris, in her capacity as personal representative, for Garris in this action resolves the standing issues.

      1.  Standing

The Garris Sublease was, indeed, executed by Garris PC and Visionary.  Garris represents in his opposition briefing Garris PC was administratively dissolved on March 21, 2014.[8]  Garris died intestate on September 14, 2014, the state court appointed Mrs. Garris personal representative for Garris's estate on December 22, 2014, and this court granted Mrs. Garris's motion for substitution of the Estate of Donald R. Garris for Donald R. Garris as plaintiff on May 1, 2015.  (Pls.' Mot. for Substitution at 2-3.)

Garris PC was a professional corporation, incorporated under OR. REV. STAT. 58.005-58.300.  In the absence of a conflict, professional corporations are also subject to the provisions of the Oregon Business Corporation Act (the "Act").  OR. REV. STAT. 58.045 (2013).  The Act gives corporations the right "to sue and be sued and complain and defend in its corporate name."  OR. REV. STAT. 60.077(2)(a) (2013).  The Secretary of State may administratively dissolve a corporation if the corporation fails to pay required fees, file an annual report, is without a registered agent, fails to provide current information on its registered agent, or the period of duration as stated in the articles of incorporation expires, and the corporation fails to cure the defect after reasonable notice.  OR. REV. STAT. 60.647 (2013).  Upon dissolution, the corporation's corporative existence continues solely for the purpose of winding up and liquidating the corporation's affairs, including distribution of the corporation's assets to its shareholders.  OR. REV. STAT. 60.637, 60.651(3) (2013).  The

---

[8]The court acknowledges Garris's representation is not supported by evidence.  However, the court takes judicial notice of the records of the State of Oregon confirming Garris PC was administratively dissolved on March 21, 2014.

dissolution of a corporation does not "[p]revent commencement of a proceeding by or against the corporation in the corporation's corporate name." OR. REV. STAT. 60.637(2)(e) (2013).

A shareholder of a dissolved corporation who has received corporate assets has standing to assert claims for such assets once the corporation ceases to exist. *Coto Settlement v. Eisenberg*, 593 F.3d 1031, 1031-32 (9th Cir. 2010). Relevant statutes generally determine when a dissolved corporation ceases to exist. *Id*. at 1037 (in Nevada, two-years; in Delaware, until certificate of cancellation is filed in Delaware; in Montana, five years after publication of notice). The Oregon statutes do not provide a specific rule for when a dissolved corporation loses its corporate identity. Rather, they allow an administratively dissolved corporation to maintain its corporate status for the limited purpose of winding up and liquidating the corporation's business and notifying claimants. OR. REV. STAT. 60.651(3). Implied in the Oregon statutes is that once these tasks are completed, the corporation ceases to exist.

This action was filed on July 16, 2014, nearly four months after Garris PC was administratively dissolved. Based on the evidence before the court, it is reasonable to assume the winding up of Garris PC's affairs occurred within that four months. Garris PC operated out of a subleased space using equipment primarily provided by Defendants, thus leaving few assets to be distributed. Garris PC had not been active since August 2013, when Garris became ill. Thus, Garris PC adequate time to pay all creditors before the administrative dissolution. While the court does not have evidence of the manner in which the assets were distributed, it is undeniable that Garris, as the holder of the professional license and a required shareholder of the professional corporation, received

/ / / / /

/ / / / /

some, if not all, of Garris PC's remaining assets.[9]   Garris PC's right to enforce the terms of the Garris Sublease, and any damages resulting therefrom, was a corporate asset distributable to its shareholders. *See City of Klamath Falls v. Bell*, 7 Or. App. 330, 341-42 (1972)(sole shareholders of dissolved corporation entitled to corporate asset of possibility of reverter of land).   Accordingly, Garris had the right, and standing, to pursue an action for breach of the Garris Sublease Agreement. Upon his death, that right passed to Garris's estate and Mrs. Garris, as the personal representative of his estate, may pursue that right.  Defendants' motion to dismiss Garris's claim for breach of the Sublease Agreement for lack of standing is denied.

2.  Oral Contract

Like Schulz, Garris argues his long-term relationship with Defendants established Defendants would continue such relationship in the absence of good cause or malfeasance.  The termination of the Garris Sublease allegedly violated this agreement.   To recover on a claim for breach of contract, Oregon[10] courts require the existence of a contract, the performance of the terms of the contract by the plaintiff, the failure of defendant to perform its contractual obligations, and resulting damages. *Slover v. Oregon State Bd. of Clinical Social Workers*, 144 Or. App. 565, 570 (1996).  Where a written contract exists, the Oregon courts consider extrinsic evidence, such as evidence of the circumstances and conduct of the parties during the life of the agreement, only when the written contract provisions are ambiguous. *Harris v. Warren Family Props.*, LLC, 207 Or. App. 732, 738 (2006).

---

[9]This assumption is supported by the representation in Garris's opposition brief that Garris was the sole shareholder of Garris PC.

[10]As the premises covered by the Garris Sublease is in Oregon, Oregon law governs  claims relating to the Garris Sublease, according to the express provisions of the Garris Sublease.

Like Schulz, Garris has failed to offer evidence of any representation or promise by Defendants to Garris based solely on their relationship or course of conduct. Garris's reliance on a promise to assist in the sale of his practice based on Defendants' knowledge of purchases and sales of other optometrists is equally misplaced. Garris fails to present evidence Defendants assisted in, or even had knowledge of, such activity. Justine stated she told Rockwood she was trying to find a buyer for Garris's practice. She did not indicate she requested, or that Defendants offered, assistance in finding such buyer.

Garris also relies on a statement made by Constancio in May 2013 that the sublease would be renewed, Garris PC had nothing to worry about, and everything was fine. The sublease was, in fact, renewed in June 2013 as promised. Constancio did not represent the sublease would be renewed every year in the absence of good cause or malfeasance. To the contrary, Garris was advised on at least two occasions his performance could affect Defendants' renewal of his sublease, clearly putting Garris on notice the renewal of his sublease was not guaranteed. Additionally, Garris's concern about the renewal of his lease in May 2013 is evidence he was aware he was not assured of a continuing relationship with Defendants. Garris has failed to present any evidence of an enforceable agreement other than the Garris Sublease.

3. Garris Sublease

The Garris Sublease specifically allows either party to cancel the Garris Sublease for any reason with thirty days' written notice. Defendants contend they terminated the Garris Sublease in November 2013 at the request, or at least with the consent, of Garris. Garris presents evidence he never requested, or agreed to, the termination of the Garris Sublease but, rather, sought Defendants' assistance in finding a buyer for Garris's practice, creating a genuine issue of fact on whether the

Garris Sublease was terminated by mutual consent. This genuine issue of fact is fatal to Defendants' motion for summary judgment on Plaintiffs' breach of contract claim based on the termination of the Garris Sublease before the end of its one-year term.

Additionally, while Defendants represent they agreed to waive Garris's obligation to provide thirty days' written notice of his desire to terminate the Garris Sublease, there is no evidence, or even suggestion, Garris waived Defendants' obligation to provide such notice. Defendants provided written notice of its intent to terminate the Garris Sublease in a letter dated October 23, 2013. Assuming Garris received the notice on October 28, 2013, three business days after it was mailed, Defendants' termination of the Garris Sublease was effective November 27, 2013, under the terms of the Garris Sublease. Defendants' termination of the Garris Sublease, effective November 1, 2013, was premature by twenty-seven days and, in the absence of mutual agreement to terminate the Garris Sublease, appears to be a breach of the terms of the lease. Defendants are not entitled to summary judgment on Garris's claim for breach of the Garris Sublease.

## II.  Intentional Interference with Economic Relations

Plaintiffs allege Defendants intentionally and improperly interfered in their relationship with their customers by terminating their respective sublease agreements based on their age and illness. They additionally allege interference in Schulz's, and others' attempts to purchase Garris's practice. Defendants argue they were within their legal rights to not renew or terminate the subleases and Plaintiffs have failed to establish the requisite improper purpose or means element of a intentional interference with economic relations claim ("Interference Claim").

### A.  Schulz

The prima facie elements of an Interference Claim in Washington are:

(1) the existence of a valid contractual relationship or business expectancy; (2) that defendants had knowledge of that relationship; (3) an intentional interference inducing or causing a breach or termination of the relationship or expectancy; (4) that defendants interfered for an improper purpose or used improper means; and (6) resultant damage.

*Leingang v. Pierce Cnty. Med. Bureau, Inc.*, 131 Wash.2d 133, 157 (1997). The exercise, in good faith, of one's legal interest is not improper interference. *Schmerer v. Darcy*, 80 Wash. App. 499, 502 (1996) (citing RESTATEMENT (SECOND) OF TORTS § 733 (1997)).

Defendants had the legal right to not renew the Schulz Sublease and to decline Schulz's attempts to assume the Garris Sublease. Consequently, Defendants did not act with improper means in doing so. While Schulz alleges Defendants acted with the improper purpose age discrimination, he has presented no evidence to support this allegation, such as statements from Defendants that they intended to get rid of all of the older optometrists or evidence Defendants replaced Schulz with a substantially younger optometrist.

In his opposition briefing, Schulz argues for the first time HVHC interfered in his contractual relationship with Visionary by directing Visionary to not renew the Schulz Sublease. Visionary's contractual relationship with Schulz ended on March 31, 2012, with the scheduled termination of the Schulz Sublease. Visionary was under no obligation to continue its relationship with Schulz. Consequently, any direction from HVHC to Visionary to not renew the sublease may have prevented Schulz from entering into a new contractual relationship with Visionary, but did not affect any relationship in existence at that time. HVHC had the legal right to recommend, or direct, Visionary to not renew the Schulz Sublease and Schulz failed to present evidence supporting his claim the recommendation was based on Schulz's age. Defendants are entitled to summary judgment on Schulz's Interference Claim.

*B. Garrris*

To state an Interference Claim under Oregon law, a plaintiff must allege:

(1) the existence of a professional or business relationship; (2) intentional interference with that relationship; (3) by a third party; (4) accomplished through improper means or for an improper purpose; (5) a causal effect between the interference and damage to the economic relations; and (6) damages.

*Nw. Natural Gas Co. v. Chase Gardens, Inc.*, 328 Or. 487, 497 (1999). The interference must be wrongful "by some measure beyond the fact of the interference itself. Defendant's liability may arise from improper motives or from the use of improper means. They may be wrongful by reason of a statute or other regulation, or a recognized rule of common law, or perhaps an established standard of a trade or profession." *Top Serv. Body Shop v. Allstate Ins. Co.*, 283 Or. 201, 209 (1978). As a matter of law, enforcement of a contractual right will not support an Interference Claim. *Uptown Heights Assocs. Ltd. P'ship v. Seafirst Corp.*, 320 Or. 651-52 (1995) ("When a party invokes an express contractual remedy in circumstances specified in the written contract – conduct that reflects, by definition, the reasonable expectations of the parties – that party cannot be liable for intentional interference with economic relations based solely on that party's reason for invoking the express contractual remedy.")

Defendants had the right to terminate the Garris Sublease with thirty days notice. Defendants' failure to give Garris the requisite notice arguably satisfies the requirement of improper means. However, at the time the Garris Sublease was terminated, Garris was looking for an optometrist to buy his practice and clearly had made the decision to not continue his relationships with his patients. Consequently, Defendants' failure to give proper notice either did not interfere with Garris's relationship with his patients or did not result in any damage.

As noted above, Defendants had the legal right to refuse to allow Schulz to assume Garris's

Sublease.  Garris has failed to present evidence any other optometrist expressed an interest in purchasing Garris's practice or that Defendants refused to allow such purchase.  Defendants are entitled to summary judgment on Garris's Interference Claim as well.

III.  Implied Duty of Good Faith and Fair Dealing

Plaintiffs allege they performed all of their obligations under their agreements with Defendants, while Defendants breached their promises, representations, and inducements to Plaintiffs by terminating the respective subleases without cause and blocking the sale of Garris's practice to Schulz.  Plaintiffs again rely on alleged oral agreements separate from the subleases. The court has found Plaintiffs failed to present evidence such agreements exist.  Consequently, Plaintiffs' claim for breach of the duty of good faith and fair dealing must be considered only with regard to the Schulz and Garris Subleases.

A.  Schulz

Washington law recognizes an implied duty of good faith and fair dealing in every contract which allows the parties to reap the full benefits of performance by ensuring cooperation.  *Badgett v. Sec. State. Bank*, 116 Wash. 2d 563, 569 (1991).  The implied duty is not "free-floating" but "exists only in relation to performance of a specific contract term."  *Id*. at 570.  If there is no breach of a specific term in the contract, there is no breach of the duty of good faith and fair dealing.  *Id*. In other words, "[i]f there is no contractual duty, there is nothing that must be performed in good faith."  *Rekhter v. Dep't of Soc. & Health Servs.*, 180 Wash. 2d 102, 113 (2014).  A party does not breach the duty of good faith by simply standing on its contractual rights.  *Badgett*, 116 Wash. 2d at 570.

The Schulz Sublease expired by its terms on March 31, 2012.  It did not obligate Defendants

to enter into a new sublease.  To the extent Schulz's duty of good faith and fair dealing is based on the terms of the Schulz Sublease, there was no breach of the contract so there can be no breach of the duty.  Defendants are entitled to summary judgment on Schulz's claim for breach of the duty of good faith and fair dealing.

    *B.  Garris*

The implied, contractual duty of good faith and fair dealing is a well-recognized part of Oregon common law.  *Best v. United States Nat'l Bank of Oregon*, 303 Or. 557, 561 (1987).  This duty requires that the parties to a contract not act in a way that destroys or injures the rights of the other, *Perkins v. Standard Oil Co*, 235 Or. 7, 16 (1963), or that frustrates or defeats the object of the contract.  *Warnock v. Bonneville Gen. Agency, Inc.*, 271 Or. 634, 639 (1975).  The contractual good faith doctrine "emphasizes faithfulness to an agreed common purpose" and is designed to "effectuate the reasonable contractual expectations of the parties."  *Best*, 303 Or. at 562-3 (citations omitted.) But, "it is only the objectively reasonable expectations of parties that will be examined in determining whether the obligation of good faith has been met."  *Tolbert v. First Nat'l Bank of Oregon*, 312 Or. 485, 494 (1991)(footnote omitted). "The obligation of good faith does not vary the substantive terms of the bargain . . . , nor does it provide a remedy for an unpleasantly motivated act that is expressly permitted by contract . . . ."  *United States Nat'l Bank of Oregon v. Boge*, 311 Or. 550, 567 (1995).  The duty of good faith is implied "only if the parties have not agreed to an express term that governs the issue."  *Oregon Univ. Sys. v. Oregon Pub. Employees Union*, 185 Or. App. 506, 511 (2002).

The Garris Sublease explicitly provides either party may terminate it with thirty days' notice.  Assuming Garris did not consent to the termination of the Garris Sublease; there is a question of fact

whether Defendants breached the terms of the Garris Sublease by providing less than thirty days' notice. The parties agreed to express terms covering the parties' mutual right to terminate the Garris Sublease, thereby preventing application of a good faith duty to such termination. Defendants are entitled to summary judgment on Garris's claim for breach of the duty of good faith and fair dealing.

## IV. Limitation of Liability Provision

The only claim to survive Defendants' motion for summary judgment is Garris's claim for breach of the Garris Sublease. Garris seeks general damages in the amount of $800,000 on this claim. Section 7.13 limits damages recoverable under the Garris Sublease, regardless of the theory of recovery, to an amount not exceeding the total amount paid or payable by Garris to Defendants pursuant to the Garris Sublease. Defendants assert Garris is, at the most, entitled to recover the $9,000 paid in rent for the months of June and July 2013. As this amount does not meet the $75,000 minimum required for diversity jurisdiction, Defendants contend this court lacks jurisdiction over this action. Garris argues the limitation of damages provision is unconscionable and unenforceable.

Federal district courts are empowered to hear only those cases that are within the judicial power conferred by the United States Constitution and those that fall within the area of jurisdiction granted by Congress. *Richardson v. United States*, 943 F.2d 1107, 1112-13 (9th Cir. 1991). Original jurisdiction must be based either on a claim involving the Constitution, laws, or treaties of the United States, or on diversity of citizenship, which applies to suits totaling more than $75,000 in controversy between citizens of different states. 28 U.S.C. §§ 1331, 1332 (2015).

Where, as here, the plaintiff files the action in federal court, "the amount in controversy is determined from the face of the pleadings" when the action is commenced. *Crum v. Circus Circus Enters.*, 231 F.3d 1129, 1131 (9th Cir. 2000). The courts apply a "legal certainty" standard when

considering whether the plaintiff has, in good faith, alleged damages that exceed the jurisdictional

amount.  *Id.*  Under the "legal certainty standard," it must be obvious upon the face of the complaint

that the suit cannot involve the necessary amount.  *Geographic Expeditions, Inc. v. Estate of Lhotka*,

599 F.3d 1102, 1106 (9th Cir. 2010)  *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S. 283,

292 (1938).  Once the court has diversity jurisdiction, subsequent events generally do not affect that

jurisdiction.  The "long standing principle" of *St. Paul Mercury Indem. Co. v. Red Cab Co.*, 303 U.S.

283 (1938), establishes that:

> [a] defect in diversity jurisdiction exists, if at all, only when a case is filed in federal
> court or removed to federal court from state court.  If a jurisdictional defect in
> existence when a suit is filed remains uncured, then any judgment in the case must
> be vacated and the case must be dismissed.  But events occurring subsequent to the
> filing or removal of a case – whether one party changes its residence, thereby
> destroying complete diversity, or the amount in controversy drops below the
> jurisdictional amount – are not "defects" in the court's jurisdiction; these subsequent
> events do not affect a federal court's diversity jurisdiction at all.

*Grinnell Mutual Reinsurance Co. v. Shierk*, 121 F.3d 1144, 1117 (7th Cir. 1997) (discussing the

compatibility of *Caterpillar Inc. v. Lewis*, 519 U.S. 61 (1996), with *St. Paul.*).

Plaintiffs did not allege specific damage amounts in their original complaint but sought

damages in amounts to be proven at trial for loss of income, livelihood, standing in the community,

employment opportunities, depletion of savings and retirement accounts, stress, anxiety, and

emotional distress.  Plaintiffs did allege annual salaries at the time of termination of their respective

subleases of $85,000 for Schulz and $80,000 for Garris.  Assuming, at a minimum, Defendants

wrongfully refused to renew the Schulz Sublease for another one-year term, Schulz's lost income

claim based on the allegations of the complaint would be valued at $85,000, satisfying the $75,000

amount in controversy at the time the complaint was filed.  The amount in controversy was more

definitively satisfied when a month later, and before Defendants filed their answer, Plaintiffs

amended their complaint to allege damages on the breach of contract claims of $425,000 for Schulz and $800,000 for Garris.

The requirements for diversity jurisdiction were satisfied when Plaintiffs commenced this action.  A subsequent decrease in the amount in controversy below the $75,000 minimum would have no effect on this court's jurisdiction.  Even if the court were to find the limitation of liability clause limited Garris's damages to $9,000, subject matter jurisdiction still would exist.  Defendants' motion for summary judgment based on the limitation of damages provision is denied.

V.  HVHC as Defendant

The sole remaining claim is Garris's claim for breach of the Garris Sublease.  HVHC was not a party to the Garris Sublease, had no obligations under the Garris Sublease, and is not liable for Visionary's alleged breach of the Sublease.  Defendants' motion for dismissal of HVHC from this action is granted.

*Conclusion*

Defendants' motion (19) for summary judgment is DENIED with regard to Garris's claim for breach of the Garris Sublease and GRANTED in all other respects.

DATED this 1st day of December, 2015.


                         /s/ John V. Acosta
                         JOHN V. ACOSTA
                         United States Magistrate Judge